Appellant. Ms. Burgess for the Appellant. Ms. Bates for the Appellee. Good morning. Good morning. May it please the Court. Bill Burgess of Kirkland & Ellis on behalf of Ezra Griffith. I'd like to reserve three minutes for rebuttal. We've raised three issues. I hope to say a couple of words about all three, but I think I'll start with the warrant. On its face, the warrant lacks probable cause in at least three respects. First, there's no probable cause to believe that Griffith ever owned or possessed any of the items that the warrant requests permission to seize and search for. There's no evidence that any of these items even exist. There's nothing about a cell phone. There's nothing about newspaper clippings or scrapbooks or any of the papers they want to rifle through in the first nine pages of the warrant. There's the first nine pages of the warrant that tell a story about a criminal investigation, and then there are these last two paragraphs that are like a detour from the first nine pages and seem to be copied and pasted from the ether. Second, there's no probable cause to believe that any of those items were located at the apartment that was searched. And third, there's no probable cause to believe that any of those items, even if they existed in 2013, contained evidence of the 2011 shooting that police were talking about investigating. Any one of those failures should render the warrant invalid, but all three of them should render the warrant still lacking an indication of probable cause that no police officer could reasonably have acted on the warrant. So can I just start you off asking you this question, which is in Riley, the Supreme Court accepted the proposition that over 90% of people own a cell phone? Yes. So what do you do with that fact? I mean, I know part of your argument is that we don't – that there's nothing referenced in the affidavit that suggests knowledge that he, in fact, had a cell phone. But if Riley tells us that 90% of the people do, does that – I guess two things about Riley. One of the things – Riley does say that about 90% of Americans own a cell phone, and I think it's – we said something in our brief to the effect that some number close to that is empirically true. Riley doesn't say that it follows from that that there's probable cause to search phones. Riley says that because of the information we keep on people's phones, court scrutiny of these sorts of warrants should be particularly heightened. But even if you accept that inference that, you know, of course Mr. Griffith owns a phone, most people own phones, that's one of many inferences they have to pile up to get to probable cause in this case. And the first nine pages of the warrant, there's no mention of a phone. In fact, one of the people mentioned Carl Oliphant at A34, the appendix, doesn't even own a phone. They rely heavily on the fact that he made calls one afternoon on a prison landline. It doesn't follow that there's probable cause to go to a residence wherever he may be found and search his phone. I guess what I'm trying to say is that there's no – even if you accept that Mr. Griffith owns a phone, they don't have probable cause to suspect that he owns a phone with evidence of criminal activity on it. They talk about him talking on a phone on a prison landline, but a phone isn't a permanent voice recorder the way a prison landline is. They'd have to be looking for texts or emails or – Mr. Bridges, it seems like the more salient limiting aspect of the three shortfalls that you talked about would be the third one. Yes. Is there any reason to think that the phone contained evidence? And we have cases that say that when people are involved in drug dealing, that there's reason to think that the home might contain the incidents of that trade. Is there any analogous evidence that you think that law enforcement could rely on in a case such as this? I don't think there is. I mean, I'm reluctant to cite a district court case to a court of appeals, but I think it's directly on point. The Garcia case from the Northern District of California, we say it talks about these drug dealer cases and says that these cases are carefully circumscribed to drug dealers. If you have evidence that someone is involved in dealing drugs, then it's a reasonable inference that they have drug paraphernalia or evidence of further drug dealing at their home. And what Garcia said is we refused – it is beyond even the good faith exception in Leon to extend that line of cases to drug users. And if you have evidence that someone is using drugs and no police officer could believe in good faith that that's probable cause to search their home, then certainly that can't be extended to a case like this. Or because someone is – perhaps you have probable cause to believe that they're involved in criminal activity. They talk to people about it one day on a prison landline and two calls to his mother and his grandmother, I might add. I mean, I'll ask the government this, but I guess I'm asking a slightly different question, which is if they do want this evidence, what do they need as a predicate for getting it? Because it is true, as an intuitive matter, that our electronics are repositories of a lot of information about our conduct. And where you have someone who's suspected of murder, you want law enforcement to have a way to find out information that might lead them to be able to prosecute the person that they have reason to believe was the perpetrator. And so what is the constitutional path? I'm not sure in this case what would clear the bar. I mean, the argument is that this falls short in several respects. But standard investigative techniques, you can do surveillance. You can investigate his associates. Any evidence to believe that he actually owns a phone in his texting would at least be a start. Perhaps finding his phone number, finding phone numbers of associates he might communicate with. The word particular is in the Fourth Amendment. Any particularized evidence to believe that he's texting with someone or that he owns a particular phone, anything further than that. I mean, there's nothing in the first nine pages of the warrant about him even owning an electronic device or writing anything. I mean, keep in mind the warrant also asserts probable cause to rifle through his papers and search for things like newspaper clippings and writings and that sort of thing. But on the issue of the phone, just any particularized evidence at all. Otherwise, the last two pages of this warrant can be copied and pasted into anything. And you have a modern-day general warrant where you just add anything. Can it be based on the fact that by hypothesis the crime involves gang activity? So you can imagine an affidavit that says, I'm an expert in dealing with gangs. I know how gangs operate. This crime bears the earmarks of a gang crime. Typically, when a gang member commits a crime, they share information about the crime with their fellow gang members, and typically they do that with cell phones and other electronic devices. I'm not aware of any precedents. There is some intuitive logic to that, I'll admit. But if that's the law, then that would mean that anyone who's in a gang who is suspected of criminal activity is subject to search at any time. Gangs are associates. If the crime arises out of their gang activity. And you may say that, well, that's not, I mean, I think your argument is that that's not what the affidavit says in this case. And I take that point. I'm just in addressing it. I think that's part of it. The answer just has to be that's closer but probably still a little bit too general. The idea is that all gang members are likely to communicate with each other. Gang members talk to each other. We think that we have probable cause to suspect someone of gang-related activity. Therefore, anyone in this gang is subject to search wherever they may be found for whatever we might find there. And we'll say in the warrant, because it's where we're investigating this gang-related activity, I think that still just has to be too general. The last two paragraphs of this warrant are basically the sorts of conclusory statements that the Supreme Court disagreed in Nathanson. And our view is the first nine pages don't support the last two paragraphs. And if you read the warrant from start to finish, it's kind of an abrupt detour the warrant takes at the bottom of 835, where he talks about this criminal investigation and how they monitor his phone calls, they find the car, they look at surveillance. And then at the very end, there's this paragraph, you know, in your affidavit's experience, gang members talk to each other and preserve evidence of their crime. And we want to go to this guy's apartment and take whatever we can find there, phones, electronics, including but not limited to this and that and all these writings. And they want to rifle through his papers too. Does it matter if Griffith actually just abandoned the gun independent of any search pursuant to a warrant, whether the warrant is patently invalid or not? That is the government's abandonment argument. I think we all agree that if there was no constitutional violation or if this was some sort of a spontaneous thing that he did, if the police just happened to be on the block that day, then we wouldn't have this argument. If someone had just thrown the gun out the window and the police had just found it, that would be abandoned property. But I think the district court recognized this at several places in the oral ruling. If it's police misconduct that prompted the abandonment, then it's not abandonment. Well, that's going to be a pretty fine question, whether it is unconstitutional conduct on the part of the police and the government, you know, besides Hodari D., and you contest that. But where is the line between, I mean, government is allowed, police are allowed to come to people's houses, they're allowed to knock on the door, they're allowed to ask to come in to talk to people. They aren't allowed without a valid warrant to go in. Are they not allowed to approach the door? Where would you have us draw the line about when this, in the house search context as distinct from in the personal stop context that we faced in Hodari D., where is the line? I guess a couple of points about that. In this case, first of all, I think the line is when they say police search warrant. And it's all over the record that they said police search warrant when they approached and knocked. It's at A18 and A19, which is the government's brief in the suppression hearing, A84, which is Officer Sharf's testimony at the suppression hearing. And the record is clear. They said police, police search warrant when they knocked at the door. And search warrant is, those are words with legal effect. That is what initiates the search in our view. The government argues at page 36 and 37 of their brief and in footnote 21 that there's no search until police officers cross the threshold. But nothing they cite actually supports that argument. In this case, there's 12 police officers who show up at a residence, bang on the door, announce police search warrant. Those words have legal effect, and everyone on the inside understands that no matter what they do, the police are coming through that door. Just like the words you are under arrest have legal significance, police search warrant initiates a search. Now, they cite Wilson v. Arkansas and Hudson v. Michigan. Again, I think that might be in the camera on the page or in footnote 21. But neither of those cases draw that line, and neither of those cases actually talk about where a search begins. Wilson holds that the knock-and-announce requirement is a command of the Fourth Amendment, and Hudson v. Michigan says that knock-and-announce violations don't necessarily subject you to the search. So if the key words are police search warrant, then if the police come to the door and say, police, can we talk to you? And then the response to that, police, can we talk to you, is somebody inside the house throws a gun out the window and lands in a public area where the police have every entitlement to be because they can go into public areas, then you wouldn't dispute that that's a government. I don't think we could. If they were coming to execute a search warrant, I think we might have an argument. But if they were just coming to ask questions, just, hey, we'd like to talk to you. Even if they're coming to execute a search warrant, suppose the police have a policy of preferring consensual searches first before they try to execute the search warrant. So if they're armed with a search warrant, they could execute a search warrant, but they don't say it. What they say is, police, can we talk to you? All right, so I guess two points in response. I want to be sure I'm actually addressing this directly. In this case, they do say police search warrant. We think that, at the very least, is when the search was underway. And the only case we found that actually suggests a real line is the Bailey case. We say no reply brief, and they talk about searches incident to executing a search warrant. And they say that the search warrant was underway when police were walking up the steps with a search warrant to execute it, and they encountered the defendant on the front steps. They hadn't said search warrant yet. They hadn't turned the key in the door or anything like that. They encountered him on the steps. They detained him and asked his help to get inside the house. Now, Bailey doesn't – isn't directly implying the sense of this case, but the closest thing to a line, actually, is the Bailey case. And Bailey discusses – I'm sorry, I should correct myself. Bailey is discussing the facts of Michigan v. Summers, which is an earlier case, and they say in Michigan v. Summers, the occupants were found on the front steps. And this is Bailey describing Michigan, and they say the moment the search began was when they were walking up the front steps to execute the search warrant, and they encountered this person on the front steps. So if they have a search warrant, they're coming up the steps to execute it. I think the search is underway in that point. But in this case, at the very least, when they knock and say, police, police, search warrant, that's when the search starts in this case. Seeming to my rebuttal, I'm happy to answer other questions the court has. I would like to make two quick points about the sentencing. Obviously, for our first two issues, we hope the court doesn't actually breach this, but there's one thing I want to clarify. There's a quote at pages 59 and 60 of the government's brief where they talk about – and the district court says, as your lawyer said, your prior record really bumps up the guidelines. I just want to make clear that that is not the district court talking about this enhancement in this case. The whole reason we're up here on plain error review is that that wasn't discussed. But the district court says that A463 lines 10 to 13 is, as your lawyer said, your prior record really bumps up the guidelines. What his lawyer said is at A54 line 9 through A55 line 23. And what Mr. Zucker is saying is that although Griffith has a lot of things in his criminal history, just the sheer number of entries bumps him up to criminal history category 5, which is the second worst. He's saying none of those things are particularly bad. And the district court accepts that point. And this is also clear, the statement of reasons, which is not in the appendix because it's sealed. It's docket number 40 at page 3. The district court uses the words criminal history. This is all about criminal history, and the 70-month sentence that the district court ultimately gave is dead center of what the advisory range would be if he had criminal history category 3 instead of 5. So to the extent the government's brief was read to suggest that the district court actually addressed this enhancement, we think it didn't. The other point I want to make is that Beckles can't change anything here because the government has conceded plain error. This is just like footnote 6 of the Sheffield opinion. We're only talking about prejudice because of the government's concession. And so this just absolutely has to go backwards if anything else. Mr. Burgess, I know that current counsel wasn't counsel at the time, but I wonder why the case did not get briefed on appeal for three years. Do you know? The answer is that there were something like 15 adjournments. No, I'm not sure. I think it's personal conflicts on the part of the attorneys. I joined the case fairly late on the docket. To answer directly, I'm not sure. I'm not prepared to answer that. I'm sorry. If there's nothing further, I'd like to save the time I have left. Thank you. Thank you. May it please the Court. Lauren Bates on behalf of Appellee of the United States. With respect to the search warrant, here the warrant affidavit established probable cause for the search that was conducted. Even if this court has questions about whether the warrant established probable cause, there is no reason why the good faith exception of Leon would not apply in this case under these circumstances where the officers executed the search warrant that was signed by a superior court judge. And the government has also made a third argument that independent of the presence of the search warrant, here appellant abandoned the gun by throwing it out the window. So before we go to abandonment, can we talk about the probable cause slash good faith? Yes. So of course Leon tells us if a warrant affidavit is sorely lacking in an issue of probable cause, then good faith doesn't apply. So to some extent, there's a significant overlap between the probable cause question and the good faith question. And as to both, there's no indicator that he has a phone. As far as I could tell, there's just nothing. We have no reason to suppose that he has a cell phone. Now, of course, it's true that many, many people do, but there's no indication that he doesn't. And as your colleague on the other side pointed out, one of the people that he called from jail didn't even have a phone. So it's at least possible he doesn't have a phone. There's also no indication that if he had a phone, it would necessarily be at the residence because most people with their cell phones, I take it, they carry them with them. So unless he happens to be home at the time that the search warrant is being executed and nothing in the warrant tells us he needs to be home at that time, there's no reason to even think that the phone that he has would be at the home. It's going to be with him wherever he is. And I assume that when he was arrested initially for something separate, that no phone was recovered on his person at that point. You might tell me otherwise, but there's no indication to that effect. So those seem to be at least significant questions about the existence of probable cause. In a typical case, the phone is going to be found on the person, and then there's going to be a question of whether the warrant can authorize a search of the phone that's found on him, which seems different than a circumstance in which you don't know that he has a phone. No one's ever seen him with a phone. At least we don't know that anybody has. And you don't know that if he has a phone, it would happen to be at this residence at a time when he might not even be there. I think a couple of points in response to Your Honor's question. The case law instructs that you view an affidavit and an affidavit is to be interpreted when making this probable cause inquiry in light of everyday experiences, realities, practical facts and circumstances. And here, as Your Honor has pointed out, and this appellant has recognized and conceded in his brief, at the time of this search warrant, the vast majority, much more than the fair probability standard, of Americans had cell phones and used electronic devices. This warrant was for cell phones and other electronic devices, so it wasn't just premised on the notion that he had to have a cell phone and that that was the way he was communicating with other individuals, although I think that was the most likely scenario. Here, the warrant affidavit contained a specific statement from a 22-year veteran on the Metropolitan Police Department who stated under oath in the affidavit that in his experience, based on his training and experience in working with other detectives, electronic communication devices, phones, computers using Facebook, Twitter, email, the Internet, were a way that closely affiliated gang and crew members communicated. So does that mean that any time there's a gang member that's accused of, that's suspected of being part of a crime, necessarily you get a warrant to search a residence where the gang member may have been living. In this case, it's not even his own residence. It's somebody else's residence. There's no reason to think he's there. You get a search warrant to search the residence of a gang member for any electronic device. I don't think that this court has to, I think that's a more difficult question than what we have on this record. What more do we have here? What more we have is that we have that this was a crime that was committed by multiple closely affiliated perpetrators. So you had three people, which is what the affidavit establishes, who committed this shooting and homicide, one of whom was in a car while two others were on foot, which gives you, again, this inference that there's orchestration, communication. You have facts and circumstances that show the close affiliation between the individuals that show that on the day that the police, on September 7th, take additional investigatory steps in the investigation, speak to Appellant's mother about the car, that on that very day, you have evidence of communications between Appellant and other members, family and other closely affiliated crew members, about the ongoing police investigation. So the affidavit establishes that this is more than just a crime in the abstract that's committed by someone who's affiliated with a gang or a crew. This is a crime committed by multiple people working together who have, in fact, even months after the crime, at the time that the police make advances in their investigation, who have demonstrated their proclivity to talk and communicate about the offense, even when... It's a proclivity to talk and communicate about the offense because they were talking about the fact of an ongoing investigation? That just seems natural. Whenever there's an investigation going on, they'll have conversations about it. And so I think that you have this... I mean, whether you say that seems natural, I think that that helps the probable cause analysis here because the affidavit shows that you have these closely affiliated people who are talking about the offense, and coupled with both the fact that cell phones and electronic communication devices are extremely prevalent at the time that this warrant was issued, and the specific statements... Were they talking about the offense or were they talking about the investigation? And the investigation into the offense, I think that you could... It seems different. They seem different to me. Does it not seem different to you? Because the fact of the investigation is a historical fact that they're discussing because it's going on. They're not talking about actually having committed the offense. Well, I mean, I think that this is evidence that would be relevant and probative towards establishing that they were the individuals who committed the offense because they are expressing concern. What do the police know? Did they know that the car was there? Did they have photographs of the car at the scene of the shooting? These are, whether you say that they are actually confessing to the offense, these are communications that would be relevant and highly probative to establishing and proving one day in a court of law that these individuals are the individuals who committed this offense. So I think in that sense, I'm not sure that there's a great difference. Additional facts are multiple individuals involved in an offense, which is to say that there's coordination, and then conversations about the investigation into the offense. A demonstrated proclivity to have these types of communications, not just in person. They were willing to have these communications on a recorded phone, jail phone, and at the time perhaps unable to use a cell phone or have full access to e-mail. But then you have a period of time shortly after those communications where appellant is no longer incarcerated, where you have statements from the detective that closely affiliated gang and crew members are known to use cell phones, e-mail, Twitter, Facebook, to communicate about their activities and about crimes that they have committed. And it takes some issue with the characterization of this residence not being appellant's residence at the time. The affidavit established that. Oh, yeah, no. I mean, let's assume it's completely his residence. I guess my question is, any time you have an affidavit that says, gang members often communicate with one another through electronic devices, and that would give you probable cause to search the residence for electronic devices. If you have additional facts that the crime involved some coordination and that there's some indicia that, in fact, the particular person actually has communications via landline or any other mechanism with other gang members. Not even other gang members, but with other individuals. I think, and the timing with the high prevalence of cell phones and the use of these electronic communication devices, those facts here, coupled together. What's the last one? I didn't quite catch that at the time. The prevalence, the fact that this was in 2011 through 2013. Nowadays. I'm just saying nowadays. It's only going to grow. Would give police probable cause. And we have to distinguish that this wasn't to search the contents of any electronic devices. This warrant did not authorize that. To search the phone, to search the home for the device. For those devices, so that then the police could go back to a judge and provide an additional showing of probable cause, asking and requesting to search those devices. And the reason that, to think of this in the context of the larger police investigation, Appellant was pointing to certain facts that had we had it in the warrant, Appellant was suggesting that it would have been, would have established probable cause. Had you had a phone number or shown that he did have a cell phone. In some, the steps that the investigation is taking to find out the phone number or find out the phone numbers that are being, that are communicating with each other. Step one is to get the phone so that you can then send a search warrant to the provider and learn the phone number affiliated with the phone. And so, to some extent, what the police are doing here is moving in a logical sequence, knowing that here we have individuals who are communicating about matters concerning this offense. Knowing that this is where Appellant is staying, the most likely place that he would keep, you know, his computers or phones that he uses for these communications. And coupled with the specific statement from the detective, that cell phones and electronic communication are prevalent and used by gang and crew members. Exactly what we have here. The warrant establishes a substantial basis to conclude that there's a fair probability that the cell phones will be found here or other electronic devices and would have relevant evidence related to the crime. And even if, you know, there's a question about whether, you know, an additional fact could have been necessary or would have been better to have in this warrant. There's no reason on this record to kind of use the very narrow exception in Leon and not apply the good faith doctrine here. Here you had a detective who went and took. There's no suggestion that there were false statements in this affidavit or material omissions. Took the facts, put them on paper, took them to a superior court judge who reviewed everything and who authorized and signed off on this warrant. The warrant is not so lacking in kind of probable cause that the officer should have known walking out of the judge's chambers that this warrant would not have authorized the search. Do we know and is it appropriate and non-prejudicial for us to know whether you in fact procured a separate warrant for searching inside any electronics or actually recovered any electronics? So you do know what was recovered because that's listed on the bottom of the front page of the warrant, the return, and there were cell phones recovered in the apartment. The record as it stands today in this case does not contain facts about any subsequent search warrants that were applied for. I have that information and I'm happy to speak out the record, and that was outside of the record that this court is inclined to know, but that was one of our points as it related most specifically to Appellant's challenge to the particularity of the warrant raised for the first time on the appeal was that had that argument been raised below, the suggestion that this warrant was overbroad because it authorized the search of the electronics that were recovered, the government would have then, and did not because it was not raised in the district court, would have then put into the record the information about subsequent search warrants that were obtained. And what's the, I know that's not at issue here, but the authority that requires, even when you have them in your possession, that you get a warrant to search inside of them is what? So I don't know that there's actually a specific case from this jurisdiction that speaks to the precise issue, but, I mean, this warrant doesn't purport to authorize the search of the contents of any devices, has no language about, you know, areas within the phones, whether it's contacts or text messages or email that would be searched or date frames, which is what you would expect in some of these warrants. And here, I mean, we know that none of that was introduced in this trial, and, you know, speaking outside the record, I can speak to other warrants that were obtained. So on the abandonment question, I thought it was clear as far back as Bumper that if officers arrive at the door and say, you know, police, open up with a search warrant, that what's done following that is not considered to be voluntary. So do you dispute that, or, I mean, on the abandonment point, I guess I'm having trouble squaring that with the notion if police come to the door and they say they have a warrant, and obviously I'm assuming that the warrant is invalid, and if it isn't, then we're not there. But if it were facially invalid and Leon didn't apply, which I understand from your perspective is a lot of ifs, then I don't see the case for voluntary abandonment. So I think looking to HODAR ID, which was decided in 1991, would be the helpful kind of analogy to how to parse this question of voluntariness. Yes, if the police say, in HODAR ID, it's a seizure, you know, police, stop, you know, turn on lights and sirens, draw a weapon, command you to stop, and you stop, at that point, I think your actions are no longer voluntary. You are seized. You are under the police authority. But if what you do is not comply with the police command or show of authority, so in the search context, that would be police, search warrant, what you do is not open the door, you know, not stop what you are doing and submit to the show of authority, but instead open the back window and try to discard and hide the evidence from the police who you know, you know, are at the door seeking to enter the apartment. The question isn't, in the government's view, isn't one of voluntariness. At that point, there has been no unlawful police activity that coerced the throwing of the gun, because what the police have done is a show of authority, whether or not, just in the seizure context, whether or not they had probable cause or RAS to stop in here, whether or not you question the validity of the search warrant that they are announcing. If the defendant does not submit to that show of authority, but instead abandons, makes the decision to abandon property, that abandonment is not excused. So that would apply after the officers enter the home, too. No. So I think that's where you have to look at the difference between the context of a search and seizure. So in Hood R.E.D., the answer is that once the suspect submits and a seizure occurs, abandonment that happens after that point, Hood R.E.D. does not say, is, you know, separate from and not a fruit of any unlawful seizure. And so here, our position is that once the search occurred, once you cross the threshold, enter the apartment, you know, have a battering ram and begin to make contact and break, you know, the property to enter the door, that that is a very different question. And we're not making that argument here today, that abandonment at that point, you know, running to the bathroom. So that still would not be unlawful activity on the part of the police, right, unless the warrant is invalid. Well, correct. Yes, but here, I guess, assuming that solely for purposes of this discussion, assuming that the warrant were invalid, I think that would be a much more difficult question. So the difference is between police search warrant, open the door, the police start to go in, somebody inside says, oh, my God, throws the stuff out the window. At that point, you say that's a fruit of an invalid search. That's a question not presented here. I guess I haven't fully looked into that. You might say that that's not even the fruit of an invalid search. I'm not sure that we would. I'm not sure that we would. But I think that that's a much more difficult question and not an argument that we are advancing in this case. As opposed to the door hadn't been opened yet. Yes, and so all you have here is the knocking police search warrant, which is analogous in the context of a seizure in HODAR ID to the show of authority. So can I ask you this? If it's an arrest warrant, if the police execute an arrest warrant and say, I'm placing you under arrest, and then the person, it's out on the street, and the person says, okay, there's no physical seizure yet, says, okay, and he does this thing where he puts his hands up and tries to hide whatever contraband it is and flips it, throws it. Would you take the position that that's abandonment, even though he's saying, okay, I'm arrested? So I think that that kind of conflates the submission and collapses the time frame of the submission and the act of abandonment, which, again, would make it a much more difficult question. Here we have 30 seconds that pass between the time of the knock and when there's kind of the opening of the door, the beginning of any Fourth Amendment activity, the search occurring. And it is simultaneous with the knock, not with the opening of the door, that the gun is thrown out of the apartment window. And so I think that here the facts are much clearer that this was not a simultaneous submission. I guess I'm just wondering whether there's any, because then in the search context, the person says, instead of, okay, I'm under arrest, they say, okay, I'm coming to the door, and they throw the thing out the window. So there's every indication that they're submitting to the search, just as there's every indication that they're submitting to the arrest. It's just that as a consequence of the assertion of, by hypothesis, unlawful police authority to seize either the person or effectively the place to search, they're reacting by getting rid of the evidence. I think submitting to the search is a difficult phrase to use here because, again, you have to have either a submission to the show of authority, which is what creates a seizure, or a search. And there is no kind of analogous line of case law about talking about submission in the search context. The search does not occur if the police are still outside of a closed door, having not breached the door in any way. You know, they haven't tried to break down the door. They haven't stepped across the threshold. The door hasn't even opened for them to be able to, where they're standing, even see into the premises. Right. Now, I follow your analogy to Hodarity. I don't think either side has stated it, but I'm just reading Supreme Court's case in Bumper v. North Carolina and just sort of trying to make sense of how this might apply in this case. When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is in sync with coercion, albeit colorably lawful coercion. When there is coercion, there cannot be consent. And I, you know, and that is a case different from this case. It's a case in which officers come in. I think they actually come into the house and someone says, go ahead, search things. She has no, you know, right to resist. But there's some logic to the notion that once you are, and it's not really the search logic. It is the seizure logic where, you know, you're told we're here and we have this, you know, we have this authority to be everywhere in your place that you no longer feel that what you do is, you can't just say, no, sorry, go away. And I will acknowledge I have not, in preparation for this argument, read the case. But a couple of points come to mind, which is that if it is true that the officers were present inside the apartment, that's a very different factual scenario than what we have here. And there is, I mean, HODARID stands for the proposition that police on the street, even when they make this show of authority that would be coercive, that would cause someone to feel that they are, you know, under kind of the police are, you know, license irons chasing their car or on the street, you know, coming to surround them, even if they have weapons drawn, in that situation, if the individual makes the decision whether or not their consent obtained under those circumstances would have been voluntary, but makes the decision not to submit and instead to, you know, flee and abandon property, I don't think the question is, had they, you know, stayed there and the police had asked for consent, would that consent have been voluntary? That's a very different, I think, legal question than what we have here and what HODARID speaks to, which is when you have the police who make a show of authority, but a search hasn't occurred or a seizure hasn't occurred yet. And instead of submitting, instead of opening the door in response to what may be, you know, viewed as a coercive statement, police search warrant, we're going to come in, which wasn't as far as they went here. But instead of responding to that statement and submitting, if an individual chooses to instead throw, you know, abandoned property, I think HODARID very clearly states that under those circumstances, that property would not be a fruit and suppression would not be the appropriate remedy, even if the show of authority was unlawful. Costally related. Do we know these kinds of precise facts about this case? Because I think the district judge didn't think that she had to decide that question. Do I? And so that, I mean, you know, if what matters is was the door open and the foot across the threshold, I don't know if that's what matters, but if that matters, wouldn't we need, and if we're there, I mean, these are a lot of ifs, wouldn't we need to remand for fact-finding on that? I don't think so in this case. First, appellant hasn't challenged the relevant facts at all on appeal as it relates to the timing of the abandonment and the knock and announce. And the record, the evidence, both from the suppression hearing and trial, was undisputed on this fact, that the testimony was that the knock and announce occurred, the officer, the containment officer, Officer Scharf outside heard the knock and announce and testified that it was simultaneous with that, that the window was opened and the gun was thrown out, coupled with, then, the facts from trial that talk about the 30-second gap between the time of the knock and announce police search warrant and when the door was first opened. I think that the record that the court has here, even if you said that the district court judge didn't make this particular finding explicit in ruling on the motion to suppress because she ultimately ruled that the good faith exception would apply even if there wasn't probable cause, there's no need for a remand here because the facts are clear and undisputed. Unless there are further questions, and on the sentencing point, I will just point this court to the sealed statement of reasons. It's the government's position here that based on the language in that which is sealed, and I won't reference here for that reason, a remand would be unnecessary. But even if it is, it would be a limited remand solely for the purpose of resentencing. Thank you. Thank you. Mr. Burgess, you may have two minutes of rebuttal time. Thank you. I'll make three points, assuming time allows. On Hodari D, the government's asking the court to extend a case that is fundamentally not about home searches with a warrant. And we have a search warrant. The apartment, not the person, is a subject to search. That's why the government's saying that it's awkward to talk about a person submitting to a search or not. When the police show up at a door with a search warrant and say, police search warrant, there's no choice about whether to submit or not. The police are coming in. That's what police search warrant means. Anyone who's ever seen the police shows knows that if you don't answer the door quickly enough for them, the battering ram is coming. To read Hodari D, it's laser focused on two things, the meaning of seizure and the incentives and dynamics involved when police spontaneously encounter someone on the street and order them to stop. Hodari D says things like, we have little reason, we suspect that very few of these orders to stop will be unconstitutional. We don't want to give people incentives to run from the police. You're talking about split second decisions made by police officers and suspects on the street. This is Fourth Amendment rights are at their height in the home. This is a warrant that was sworn out three days before. Hodari D doesn't apply to this case. The government also talked about proclivity. If you look at pages A32 and A33, this is the warrant. The phone calls are not a proclivity to talk at any time throughout his imprisonment with associates. These are four calls in one afternoon that Mr. Griffith made to his immediate family. There's two calls to his home residence, to his mother, and there's two calls to his grandmother. I think two of those calls led to a three-way – one led to a three-way call. The second call was to his grandmother's house, led to a three-way call to his mother's work. Then there was a call to home, which led to a three-way call to his child's mother and a call to his brother. This is the afternoon the police go to his house. He talks to his immediate family about the investigation. That's not the sort of proclivity the government mentioned. The government also mentioned practical realities. We're not suggesting that they're one detail short of probable cause. The court's asking for a line. I'm trying to say that if you look at practical realities, police know how to investigate. They know how to get probable cause. If you look at the last two paragraphs of this warrant, any police officer should know that nothing in the first nine pages establishes the sort of broad-sweeping, modern-day search warrant that the last two paragraphs embody. The court has nothing further. Thank you. The case will be submitted.
judges: Brown, Srinivasan, Pillard